Josephine **JURINKO** and Ida M. Seibert, Plaintiffs,

v.

**EDWIN L. WIEGAND COMPANY**, a corporation and Local 1020, UAW, an unincorporated association, Defendants.

Civ. A. No. 69-225.

United States District Court, W. D. Pennsylvania.

Aug. 18, 1971.

Irving L. Bloom, Dent & Bloom, Greensburg, Pa., Robert A. Sedler, Lexington, Kentucky, for plaintiffs.

Donald B. Heard, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Roger Edgar, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Arnold D. Wilner, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

 This action is brought by two women [1] who allege that the defendants, Edwin L. Wiegand Company and Local 1020, UAW, have engaged in discriminatory employment practices in violation of § 703 of the Civil Rights Act of 1964.[2] Specifically, the women allege that they were not hired by the defendant Wiegand, with the participation of the defendant Local 1020, because they are married women. This opinion follows the non-jury trial of this action.

The material facts are substantially uncontested—it is the inferences to be drawn or not to be drawn from the facts that are the core of the controversy. The parties have stipulated that the plaintiffs were employees of the defendant company for a number of years prior to December 10, 1953; that at that time both were discharged from their employment because of their respective marriages; that the company's policy of discharging women upon their marriages, and of not hiring married women, was instituted at the close of World War II for the purpose of providing jobs for "bread winners" returning home from the war; and that this policy was lawful at least until July 2, 1965, the effective date of the Civil Rights Act of 1964.

After the passage of the Act, the plaintiffs sought to be reemployed by the company. In July of 1965, they approached its Personnel Director and requested that they be reinstated to

1. This action was instituted as a class action on behalf of all similarly situated persons. The evidence, however, does not reveal *any* other similarly situated persons, and therefore the minimum prerequisite to the maintenance of a class action under F.R.Civ.P. 23, viz., that the class be so numerous that joinder of all members is impracticable, is not satisfied. Accordingly, this action is not properly maintainable as a class action and will not be treated as one.

2. Section 703 of the Civil Rights Act, 42 U.S.C. § 2000e-2, provides as follows:
"(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire * * * or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex. * * *
"(c) It shall be an unlawful employment practice for a labor organization—
(1) to exclude or to expel from its membership, or otherwise discriminate against, any individual because of his * * * sex. * * *

"Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees * * * on the basis of his * * * sex * * * in those certain instances where * * * sex * * * is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise. * * *"

their former jobs. They were informed that they were not entitled to reinstatement, and that in any event the company was not then hiring. The plaintiffs subsequently submitted written applications for employment with the company as new employees—Mrs. Jurinko on September 7, 1965, and Mrs. Seibert on January 10, 1966. At the time of their applications, each was advised that the company was not then hiring new employees, but that their applications would be kept on file for future reference. In June of 1966, the plaintiffs again approached the Personnel Director of the company, seeking employment, and again were informed that the company was not then hiring. Shortly after this meeting, on July 29, 1966, the plaintiffs filed a charge of discrimination against the company with the Equal Employment Opportunity Commission.[3] The Commission investigated the charge, found probable cause to believe that the company had engaged in a discriminatory employment practice, but was unsuccessful in its attempts to mediate the matter.[4] Eventually, however, on February 14, 1969, the company offered employment to both plaintiffs. On the advice of a representative of the Equal Employment Opportunity Commission both rejected the offer.

Statistically, the evidence is that (1) at all relevant times the company employed, in production, approximately 900 persons; (2) of these approximately 900 persons, 59 were women on July 2, 1965, 58 on May 15, 1966, 56 on December 31, 1966, and 44 on March 1, 1971; (3) at all relevant times, of the women employed only three were married; (4) at all relevant times, only two married women, other than the plaintiffs, applied for employment in production;[5] and (5) during the period from May 15, 1966 to December 31, 1966, forty-three new employees were hired, all of whom were males. There is no evidence of the qualifications of the forty-three males hired. There is evidence, however, that the plaintiffs' applications were on file during the period from May 15 to December 31, 1966, that the company was aware of their applications, and that prior experience and a good work record with the company (which each plaintiff had) were qualifications which favored an applicant. Asked why the plaintiffs had not been hired during that period, the then Personnel Director testified that he " * * * really [didn't] know * * *", but that it " * * * could [have been] many reasons * * *." A later Personnel Director testified that the company's practice of permitting "bumping" (by seniority) for each new job opening in production made it mandatory that new employees be physically able to perform each and every job in production (since the new employees were ultimately "bumped" to the most physically taxing jobs) and that the assumption under which the company operated was that women were physically unable to perform each and every production job. In conclusion, both Personnel Directors testified that the company had not pursued a policy of discrimination against married women.

On the outlined facts, judgment must be entered in favor of the defendant Lo-

3. The company contends that because the charge was filed with the Commission more than 90 days after the original meeting in June of 1965, it was untimely, and therefore this Court lacks jurisdiction of this action. Section 2000e–5(d) of 42 U.S.C. does provide that charges with the Commission shall be filed within 90 days of the occurrence of the alleged unlawful employment practice. It is clear, however, that the plaintiffs' reapplication in June of 1966 represents the occurrence of an alleged unlawful employment practice, and consequently this Court is not without jurisdiction. See Cox v. United States Gypsum Co., 409 F.2d 289 (C.A.7, 1969).

4. The Commission's findings, of course, while evidence, are not controlling in this action. See, Fekete v. United States Steel Corp., 424 F.2d 331 (C.A.3, 1970).

5. Both of these women were hired in January of 1969 at the time of the issuance by the Equal Employment Opportunity Commission to the plaintiffs of a notification of their right to sue the company under the Civil Rights Act.

cal 1020, UAW. There is a total void of evidence of its participation in either formulating or effecting the alleged employment practices of the company. On the other hand, judgment must be entered against the defendant company.

The company's initial contention that if it pursued a discriminatory policy, it was directed to married women rather than women and was therefore not "on the basis of sex" must be rejected. In Phillips v. Martin Marietta Corp., 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) the Supreme Court held that a policy of hiring men with pre-school age children but not women with pre-school age children to be a discriminatory policy which would violate § 703(a).[6] If the company discriminates against married women, but not against married men, the variable becomes women, and the discrimination, based on solely sexual distinctions, invidious and unlawful. We must now determine whether or not the company has engaged in employment practices which discriminated against the plaintiffs and, if so, whether or not the discrimination was based on "bona fide occupational qualifications".

Usually, discriminatory practices are circumstantially established by statistical inference. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (C.A.8, 1970); Alabama v. United States, 304 F.2d 583 (C.A.5, 1961), aff'd. per curiam 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). We do not think however, that the statistical evidence introduced in this case reasonably supports a conclusion that the company's general hiring policy discriminated against married women. The low number of married women employees of the company must be considered in the light of the company's pre-Civil Rights Act policy and the number of married women who have ap-plied for employment since the termination of that policy. The uncontradicted testimony is that from 1965 through 1968, the plaintiffs were the only married women who applied to the company for work in production. Two others apparently applied in early 1969 and both were offered employment. A general policy of discriminatory hiring cannot logically be concluded. With specific regard to the plaintiffs, however, the evidence of the company's extensive hiring of men during a period when the plaintiffs, with prior experience and good work records, were actively seeking employment from the company, we think is sufficient to support, if only preponderantly, an unexplained inference of discrimination.

The company contends that if it discriminated against the plaintiffs, its discrimination was based on a "bona fide occupational qualification". The contention is that because the "bumping" which occurred when a new employee was hired usually left the new employee with the most physically taxing job in production, the company's policy to require that all applicants for work in production be physically able to perform each and every production job was "reasonably necessary to the normal operation of [its] business". In implementing this policy, the company proceeded on the general and governing assumption that women, as a class, were physically unable to perform each and every job in production. No individual, objective requirements of physical abilities were established. In Ridinger v. General Motors Corp., 325 F.Supp. 1089 (D.C.S.D.Ohio, 1971), the Court decided that,

> "[A] bona fide occupational qualification is not established by an assumption or 'stereotyped characterization'

6. The Court allowed, of course, that if the distinction was founded on "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise" it would not be violative of § 703(a). No distinction was offered in the instant action of a

"bona fide occupational qualification" between married men and married women. The company's suggestion of a "bona fide occuptional qualification" of physical abilities, to be distinguished from that of marital status, will be considered hereinafter.

that very few women could perform a particular job."

To establish a "bona fide occupational qualification", the Court held, requires reference to individual capacities of individual women. See Weeks v. Southern Bell Telephone and Telegraph Co., 408 F.2d 228 (C.A.5, 1969) and Richards v. Griffith Rubber Mills, 300 F.Supp. 338 (D.C.Or., 1969). Wiegand's assumption, therefore, falls short of establishing an acceptable qualification,[7] and its discriminatory employment practices regarding the plaintiffs are thus rendered legally indefensible.

To summarize, we find that the company discriminated against the plaintiffs in violation of § 703(a) of the Civil Rights Act when it failed to offer them employment in July of 1966. Of course, we further find that this discrimination ceased in February of 1969 when the company finally offered the plaintiffs employment.[8]

■ Damages are computed as follows. The parties have stipulated that if the plaintiffs had been employed by the company for the years 1966, 1967 and 1968, Mrs. Jurinko and Mrs. Seiberg would have earned $5,127.00, $5,855.00 and $5,959.00, and $5,099.00, $5,855.00 and $5,959.00, respectively. For the period from July of 1966 to February of 1969, Mrs. Jurinko would have earned a total of approximately $14,377.00 and Mrs. Seibert would have earned a total of approximately $14,363.00. In assessing back pay, however, § 706(g) of the Civil Rights Act requires that,

"* * * [I]nterim earnings or amounts earnable with reasonable diligence by * * * persons discriminated against shall operate to reduce the back pay otherwise allocable". 42 U.S.C. § 2000e–5(g).

The parties have also stipulated that during the period from July of 1966 to February of 1969 Mrs. Jurinko, working elsewhere, made a total of $6,478.00. Reducing $14,377.00 by $6,478.00 results in damages in the amount of $7,899.00 to Mrs. Jurinko. Mrs. Seibert, on the other hand, did not work during this period. While she testified that she undertook some efforts to obtain other employment, we think that Mrs. Jurinko's successful efforts are a more accurate measure of "amounts earnable with reasonable diligence". The amount of Mrs. Seibert's damages, then, are $14,363.00 less $6,478.00, or $7,885.00. In addition, the plaintiffs are to be offered employment in production with the company, of course, as new employees. An appropriate Order will be entered.

This opinion constitutes the findings of fact and conclusions of law required by F.R.C.P. 52(a).

---

7. While both plaintiffs testified at trial that there were certain production jobs of the company which they thought they might not be able to perform, the company did not legitimately make this determination at the time it rejected the plaintiffs' applications. Indeed there is no evidence that it had objective standards by which to measure an applicant's physical abilities.

8. The rejection of the offers was not within the control of the company and should not work to its disadvantage. In any event, the amounts which would have been earned if the plaintiffs had accepted the offers would mitigate the damages.