Mary F. McADORY, Individually and on behalf of all others similarly situated,

v.

SCIENTIFIC RESEARCH INSTRU-MENTS, INC., a Maryland cor-poration.

Civ. A. No. 71–427.

United States District Court, D. Maryland.

Feb. 23, 1973.

Kenneth L. Johnson, Gerald A. Smith and Howard, Brown & Williams, Baltimore, Md., for plaintiff.

Robert J. Thieblot and Allen, Thieblot & Alexander, Baltimore, Md., for defendant.

NORTHROP, Chief Judge.

Mary F. McAdory, the plaintiff, a black woman, originally instituted this suit as a class action pursuant to both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, the Civil Rights Act of 1866, against Scientific Research Instruments, Inc. (SRI), of Baltimore, Maryland. Subsequently, the Equal Employment Opportunity Commission (EEOC) ruled that it lacked jurisdiction to investigate plaintiff's charge of discrimination because, at all pertinent times, the defendant employed less than twenty-five individuals, the statutory prerequisite to any action under Title VII; and by agreement of the parties, all claims except those arising under section 1981 were withdrawn. This case was tried on its merits on January 26 and 29, 1973.

The defendant, a small corporation founded in 1967, is engaged in the development and manufacture of complex medical equipment and other sophisticated devices for the control of air and water pollution as well as scientific research in related fields. The principal product is a mass spectrometer, known commercially as "medspec," which is used in hospitals to monitor body fluids during operations. It is an expensive and complicated device which analyzes the compositions of these fluids by a computation of the different atomic weights, and it ranges in price from $15,800 to $30,000. Other products developed and marketed by the defendant include a chemical ionization source for large mass spectrometers, another large mass spectrometer known as "drugspec" or "biospec," and a multicatheter—a tube placed in the blood stream to measure blood pressure and gas flow in the blood stream.

The defendant company has several classifications of employees which include executives, engineers, scientists, electronic technicians, draftsmen, administrative personnel, assemblers and maintenance workers. Due to the very technical nature of the work over half of the employees have advanced degrees, especially those in the research and development area. SRI has never employed a black executive, scientist, engineer or electronic technician. Since defendant does not make entries on its personnel records to reflect race, an accurate count of black employees was impossible, but the defendant did present evidence to the effect that prior to June, 1969, it hired several black assemblers, several black maintenance men, with blacks not overly represented in this category as compared to the position of assembler, and a black draftsman. After June, 1969, SRI hired another black assembler and a black clerical worker.

SRI has no written guidelines for initial employment, for later advancement

or for wage increases. Wage increases are based on time, experience on the job, and upon a review of the employee's progression by the immediate supervisor and the officers of the company. The lack of guidelines for advancement is in part based on the lack of a possibility of progression from one position to another, and in part is based on the very smallness of the company. Since advanced degrees or schooling are required for the positions of electronic technician, engineer and scientist, experience alone will not qualify an assembler, clerical worker or maintenance man for one of these classifications.

Defendant's hiring procedure is not unusual for a small company. The determination that a new position is available is made at a meeting between the officers of the company and the foreman or immediate supervisor concerned. The hiring process consists of three interviews, the first being conducted by the immediate supervisor of the department to which the new employee will go and the others by the company officer in charge of personnel. The number and length of these interviews depends on the experience and qualifications of the applicant, and clearly unqualified applicants are usually rejected after only a short conference. Although there are no pre-set written guidelines for the defendant's job classifications, SRI does look for a special type of person due to the unique requirements of the company. Since the company does not operate an assembly line operation and each worker must function with a minimum of supervision, an employee must possess a high degree of initiative and technical proficiency. Employing such a system SRI attempts to select only the best qualified applicant, and those hired must be familiar with electronics, able to read somewhat complex schematic diagrams and assemble an entire unit.

On June 12, 1969, Mary F. McAdory, the plaintiff, in company with Judith Elizabeth Feimster, also a black woman, applied for the positions of electronic technician or wireman-assembler in re-sponse to an advertisement placed in a local newspaper by the defendant. Mrs. McAdory and Miss Feimster filled out applications listing their qualifications and job experience. Both were interviewed by Albert C. Nash, the foreman in charge of the wiremen-assemblers. After a brief conference, Mrs. McAdory was informed that the company did not have a position available for which she was qualified. Miss Feimster, however, received a much longer interview, and was told that she would be contacted later if she were selected. The next day, Mrs. McAdory saw the same advertisement in the paper, called SRI, and was told that the job was still available. Incensed, she immediately filed a complaint with the EEOC. Several days later Miss Feimster returned to SRI, and was again told that the company was hiring and that she would be notified; however, she never again heard from SRI.

Mrs. McAdory is a high school graduate and the holder of certificates representing completion of courses in aircraft blueprint reading, aircraft riveting and low temperature soldering. Her job experience consists of working for Glenn L. Martin Company on an assembly line, mostly operating a riveting gun but also occasionally using an air gun and an air hose on that assembly line. When there were slack periods on the line she would go to another assembly line to perform soldering tasks under very close supervision. This limited soldering experience was gained in the 1940's. After some years as a riveter, Mrs. McAdory was promoted to the position of first class plater. In this classification she supervised other workers and performed metal plating operations. After being laid off by Martin Company she was employed by Westinghouse where she again worked on an assembly line, and engaged in rinsing, cleaning and plating certain wafers used by that corporation. In April, 1969, she was laid off by Westinghouse, and it was as a result of this layoff that she applied to the defendant for a position. After unsuccessfully

applying with many companies, plaintiff obtained a job, on March 7, 1970, as a letter carrier with the United States Postal Service. It is interesting to note that Mrs. McAdory filed claims of employment discrimination against most of the companies to which she applied during this period.

Miss Feimster, on the other hand, has had approximately eighteen years' experience as an assembly line worker in the electronics industry. She has soldered parts onto circuit boards and has·assembled electronic chassis, but has always been on an assembly line under close supervision. Miss Feimster had a very limited ability to read electronic schematic diagrams, and it must be pointed out that she had only a most sketchy ability to identify the various electrical components and to read the color codes painted on them. She did not know the purpose and function of these parts. In addition, she admitted that she was unable to take a schematic diagram with the components listed on it to the supply room and obtain these parts on her own; for in all her prior jobs she was closely supervised and provided with any parts that were required.

Plaintiff, Mrs. McAdory, contends that the sole reason behind her being rejected by SRI was her race; and claims that her experience and education made her as qualified as those who were eventually hired by the defendant. The only evidence of discrimination on which Mrs. McAdory based her conclusion of discrimination in hiring and promotions was the fact that the day after her rejection by the defendant she was told that the job was still open.

## CLASS ACTION

Plaintiff brought this suit pursuant to Rule 23(b)(2) and (3) on behalf of all similarly situated black citizens who have in the past desired or who in the future may desire to be employed by the defendant. In her pleadings plaintiff alleged that her class also included present employees, and thus made an "across the board" attack on defendant's employment practices. Prior to a decision on certification, plaintiff abandoned the subclass of present employees, and now only seeks to establish a class composed of black citizens who in the past desired and those who in the future may desire to be employed by the defendant. This Court will, therefore, confine its analysis of the purported class to these latter two groups.[1]

Any suit, if it is to be properly maintained as a class action must satisfy the following four requirements of Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative will fairly and adequately protect the interests of the class.

In addition to satisfaction of these prerequisites, the action must fall within one of the categories listed in Rule 23(b).

A determination as to whether a suit may be maintained as a class action should be made as soon as practicable after the commencement of the action. Fed.R.Civ.P. 23(c)(1). This rule is said to contemplate a quick determination. Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 42 F.R.D. 324, 326–27 (E.D. Pa.1967). In the instant case a pre-trial hearing on the class action issue was conducted, and after considering the matters brought out at that proceeding this Court was doubtful that the numerosity requirement had been complied with and also had some concern as to whether the membership of the class was capable of definite identification. It did appear, however, that the plain-

---

1. In any event, the plaintiff did not present evidence of racial discrimination in personnel policies.

tiff complied with the other three requirements of Rule 23(a). As a result of these factors a decision on certification was held in abeyance to allow full discovery to proceed on the issue of the composition of the class, and a decision on this matter has not yet been made.[2]

■ Assuming the four requirements of Rule 23(a) are met, a decision must still be made as to whether this suit falls under Rule 23(b)(2) or (3). The cause of action brought by the subclass of past job applicants can only be construed as primarily an action for damages—both compensatory and punitive. Although some courts have allowed monetary relief under a Rule 23(b)(2) action [Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Baxter v. Savannah Sugar Refining Corp., 350 F. Supp. 139 (S.D.Ga.1972)], this Court does not feel that these authorities can be read to allow suits primarily for damages to be maintained under Rule 23(b)(2) [Committee Note of 1966 to Rule 23 as Revised in 1966, 3B J. Moore, Moore's Federal Practice ¶23.01[10.–2], at 23–28 (2d ed. 1969)]; and to the extent that plaintiff's class action is a suit for damages, it is not maintainable under that provision.

■ Before allowing such a damage claim to proceed under Rule 23(b)(3), however, this Court must determine "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). In order to maintain a (b)(3) class action, plaintiff must present a definite and identifiable class so that notice can be given. Yaffe v. Powers, 454 F.2d 1362 (1st Cir. 1972). Since it is inconceivable that a class of people not yet in existence can be adjudged damages in this case, it follows that the only remedy available for future applicants must be injunctive.

Prior to trial, plaintiff failed to delineate the composition of the subclass of past black applicants—she did not identify anyone other than herself. On the day of trial she did produce Miss Feimster, but did not identify any other persons in the class. In light of these factors, this Court would have been, and is, justified in denying certification of this suit as a Rule 23(b)(3) action [see Hammond v. Powell, 462 F.2d 1053 (4th Cir. 1972)]; for the existence of only two people claiming damages would make joinder a superior method of handling this case.

A Rule 23(b)(2) certification, however, is another matter, because this type of action has been said to be uniquely suited to civil rights suits where the members of the class are often "incapable of specific enumeration." Yaffe v. Powers, *supra*; Committee Notes of

---

2. An alternative solution to the problem then faced by the Court would have been a conditional certification, pending further amplification by the plaintiff, pursuant to Rule 23(c)(1). *See* Harvey v. International Harvester Co., 56 F.R.D. 47 (N.D.Cal.1972). *Contra* Allen v. Pipefitters Local No. 208, 56 F.R.D. 473 (D. Colo.1972) (where the district court held that a similarly phrased class was not definite and identifiable and refused certification). The Fifth Circuit has indicated that an employment discrimination case is by nature a class action. Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968); Johnson v. Goodyear Tire & Rubber Co., 349 F. Supp. 3 (S.D.Tex. 1972). Further, there is uncertainty as to exactly what constitutes the requisite numerosity for a class action, and the Fourth Circuit has allowed the trial court great latitude in this regard. Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967) ("No specified number is needed to maintain a class action under Fed.R. Civ.P. 23; application of the rule is to be considered in light of the particular circumstances of the case and generally, unless abuse is shown, the trial court's decision on this issue is final.") *But see* McGriff v. A. O. Smith Corp., 51 F.R.D. 479, 484 (D.S.C.1971). The question of whether Mrs. McAdory was a proper class representative, furthermore, presents little difficulty. *See* Harvey v. International Harvester Co., *supra*; Johnson v. ITT–Thompson Indus., Inc., 323 F. Supp. 1258 (N.D.Miss.1971); Carr v. Conoco Plastics, Inc., 295 F.Supp. 1281 (N.D. Miss.1969), *aff'd*, 423 F.2d 57 (5th Cir. 1970).

1966 to Rule 23 as Revised in 1966, 3B J. Moore, Moore's Federal Practice ¶ 23.-01[10.–2], at 23–28 (2d ed. 1969). In employment discrimination cases, furthermore, some courts have been most liberal in allowing certification under Rule 23(b)(2). *See* Johnson v. Goodyear Tire & Rubber Co., 349 F.Supp. 3, 11 (S.D.Tex.1972); Harvey v. International Harvester Co., 56 F.R.D. 47 (N.D.Cal.1972). *Cf.* Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969); Johnson v. ITT–Thompson Indus., Inc., 323 F.Supp. 1258 (N.D.Miss.1971). It would seem, therefore, that this Court could have properly certified plaintiff's suit conditionally as a Rule 23(b)(2) class action subject to modification at any time prior to a decision on the merits.[3]

██ A plaintiff, however, has the burden of establishing that all the requisites of a class action are complied with. Danner v. Phillips Petroleum Co., 447 F.2d 159 (5th Cir. 1971); Cash v. Swifton Land Corp., 434 F.2d 569 (6th Cir. 1970); Demarco v. Edens, 390 F.2d 836 (2d Cir. 1968). Obviously, one of the essential requirements of a class action is the existence of a "class," and when it appears that a class does not exist, an action under Rule 23 cannot be maintained. Jurinko v. Edwin L. Wiegand Co., 331 F.Supp. 1184 (W.D.Pa. 1971) (evidence failed to reveal any other similarly situated persons besides the two women plaintiffs—numerosity not met.); Olson v. Regents of Univ. of Minnesota, 301 F.Supp. 1356 (D.Minn. 1969); 3B J. Moore, Moore's Federal Practice ¶ 23.04, at 23–251 and n.1 (2d ed. 1969).

██ In the instant case the plaintiff was unable to establish that defendant employed racially discriminatory hiring or personnel practices and did not come forward with any indication of others in her class, despite ample opportunity to do so. In light of such a failure, this Court concludes that plaintiff has failed to show that a class exists, and, thus,

this action is not maintainable as a Rule 23(b)(2) class action. Since "an allegation of class representation is attended by serious consequences" [Danner v. Phillips Petroleum Co., *supra* at 164 *quoting* Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 42 F.R.D. 324, 328 (E.D.Pa.1967)], a trial court that determines during the proceeding that a class does not exist can strip the action of its class features. *See* 3B J. Moore, *supra*, ¶ 23.02–2, at 23–157.

A denial of certification in this case, furthermore, does not conflict with the Fourth Circuit's recent decisions of Moss v. Lane Co., 471 F.2d 853 (4th Cir. 1973), and Cox v. Babcock & Wilcox Co., 471 F.2d 13 (4th Cir., 1972). In those cases the District Courts rejected the plaintiff's individual claim and as a result of that determination dismissed the class action on the basis that the plaintiff was not a proper representative of the class. Although this Court does find that the individual plaintiff was not discriminated against, it further finds that the plaintiff has totally failed to establish the existence of a class; and it is on this basis that certification is denied.

During the course of the trial, plaintiff, through her attorney, indicated to the Court that she was limiting her prayer for relief to an injunction against future discrimination; but since she did not establish discrimination, a basis for injunctive relief was not made out. On the contrary, the evidence indicated that the defendant was in fact hiring blacks. Thus, even assuming that a Rule 23(b)(2) class can be said to exist, this Court cannot grant an injunction in favor of that class.

## DISCRIMINATION AGAINST THE INDIVIDUAL PLAINTIFF

██ Plaintiff relies on the absence of written guidelines and defendant's failure to hire Mrs. McAdory and Miss Feimster to establish her charge of individual discrimination and racial discriminatory policies in hiring.

---

3. *See* note 2 *supra*.

The evidence presented in this case was limited to the policies surrounding the hiring of wiremen-assemblers which is the job for which both women applied. Although it is true that there were no written guidelines and that no tests were administered, it is clear that certain objective requirements existed in the minds of the interviewers. The evidence established that the company wanted a wireman-assembler who could read an electronic schematic diagram, who could understand it, who could identify parts from the diagram and procure them independently from the store room, who could assemble circuits independently, who was versed in the various color codes, who understood the purposes and functions of the various electrical parts, who was sufficiently proficient to insure his own quality control, and who could work with a minimum of supervision. Defendants relied on an extensive interviewing procedure to determine if an applicant had the requisite proficiency; and where an applicant clearly lacked these requisites, he was summarily rejected, but where there was an indication that the applicant might have what the company wanted, the interviews were more extended.

Mrs. McAdory's interview with Mr. Nash was quite brief, and it is quite clear from the evidence that her qualifications were not those needed for the position defendant had available. Her experience was that of a riveter and a plater, not that of an electrical worker. She had only a minimal soldering background. Although it is true that she had training in blueprint reading, this was in the aircraft field which is not closely related to electronics. It is difficult to comprehend how a course in aircraft blueprint reading can qualify one to read electrical schematics which depict electrical circuits. Further, the soldering experience Mrs. McAdory did have was very limited and over twenty years old; and the evidence established that Mrs. McAdory had absolutely no ability to read the schematics presented to her at the trial. This Court, therefore, finds that Mrs. McAdory was unqualified for the job of wireman-assembler, and that her rejection was not based on her race.

Miss Feimster had much more experience as an electrical worker than did Mrs. McAdory, but it was all upon an assembly line under close supervision. It was apparent that she could not adequately read a schematic diagram, that she could not identify parts, that she did not adequately understand the color code, and that she did not understand the purposes and functions of the various electrical parts. She did not, furthermore, have the initiative required for the job, because she admitted that she could not go to the supply room and procure the necessary parts on her own; and it is also apparent from the evidence that Miss Feimster could not work without the close supervision which the defendant company was unable to provide. In light of the job experience in a related industry that she listed in her application, Miss Feimster was given a longer interview than was Mrs. McAdory, and she was also told that she would be called if selected. Thus, it appears that the defendant did consider Miss Feimster for the position, but rejected her on the basis of the first interview. This Court, therefore, finds that Miss Feimster was not qualified for the job that was available, and that she was not rejected due to her race.

## DISCRIMINATORY HIRING PRACTICES

In addition to the absence of written guidelines and the failure to hire both Mrs. McAdory and Miss Feimster, plaintiff claims to rely on statistical evidence to support her charge of racial discrimination in defendant's hiring practices. Upon a review of the evidence presented in this case, the only statistics that can be found in the record is a request that this Court take judicial notice of the fact that twenty-two to twenty-four percent of the people in the Baltimore metropolitan area are black. Using this as statistical evidence, plain-

tiff argues that she has made out a prima facie case of discrimination, because the defendant does not employ such a percentage of blacks on its work force. Having made such a showing, plaintiff contends that the burden shifts to defendant to rebut the discrimination thus established.

While it is true that a plaintiff may employ valid statistical evidence to establish a prima facie case of racial discrimination and thus shift the burden to the defendant to refute the inference of discrimination [United States v. Chesapeake & O. Ry., 471 F.2d 582 (4th Cir. 1972); Johnson v. Goodyear Tire & Rubber Co., 349 F.Supp. 3 (S.D. Tex.1972)], plaintiff's use of statistics in this case falls far short of establishing a prima facie case.[4] Here the plaintiff merely asks the Court to take judicial notice of a population percentage of questionable validity and attempts to meet her burden in this manner. Assuming that judicial notice is taken of this percentage, it does not establish a prima facie case when such a figure is compared to the percentage of blacks employed by the defendant; for plaintiff makes no effort to show the percentage of black electrical engineers, black Ph.D.'s, black draftsmen, black electrical technicians or black secretaries in Baltimore, or to show the number of blacks that have applied with the defendant and have been rejected in each job classification. At this juncture it is not necessary to determine the quantum of statistical evidence necessary to successfully shift the burden, for it is sufficient to hold that mere citation of a general population figure without adequate correlation will not suffice.

The absence of written guidelines, furthermore, does not establish discriminatory hiring practices in this case. Whatever impact the lack of written guidelines may have upon a larger corporation under Title VII and the EEOC regulations, this suit is brought pursuant to 42 U.S.C. § 1981, against a company to which Title VII did not apply. SRI, as a small corporation with limited personnel resources and continually changing labor requirements, will experience unnecessary hardship in maintaining such documents; and the fact that the Congress excused small businesses from the applicability of Title VII provisions evidences a legislative intent that companies such as SRI be excused from complying with the mechanical requirements applicable to larger businesses. *See* 42 U.S.C. § 2000e(b) (1970).

Although defendant did not have written guidelines or job descriptions, it did have certain objective criteria, set forth above, which it applied to applicants.[5]

---

4. In those cases where a plaintiff established his burden by statistics, extensive statistical evidence was compiled and presented—showing percentages, breakdowns and correlations. *See* United States v. Chesapeake & O. Ry., 471 F.2d 582 (4th Cir. 1972); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Parham v. Southwestern Bell Tel. Co., 433 F.2d 421 (8th Cir. 1970); Johnson v. Goodyear Tire & Rubber Co., 349 F. Supp. 3 (S.D.Tex. 1972). *Cf.* Armstead v. Starkville Municipal Separate School Dist., 461 F. 2d 276 (5th Cir. 1972). It is important to note, furthermore, that these cases dealt with large corporations and municipal bodies, organizations with extensive labor requirements. A court must be especially careful in the use of statistical evidence where the defendant is a small company.

5. In Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1383 (4th Cir. 1972), the court indicated that objective standards were those based on "education, experience, ability, length of service, reliability, or aptitude." SRI's criteria cannot be said to be objectionable under this formulation.

There was testimony by Mr. Nash that certain subjective factors entered into his consideration in hiring interviews, but this does not refute the existence and application of the objective standards. Certainly the mere existence of some subjective elements in hiring decisions does not equate with discrimination, for such a rule would unduly restrict small employers. Of course, subjective factors cannot be used as a mask for discrimination, but absent some evidence that would establish such discrimination, a degree of

Plaintiff did not establish that defendant failed to apply these criteria in its hiring practices, and she also failed to show that the persons hired by defendant did not meet these criteria. In fact the uncontroverted evidence is that the defendant did apply these objective criteria in hiring.

■ Since plaintiff has failed to establish a pattern of discrimination, it was not necessary for the defendant to present the defense of business necessity; but this Court will analyze the criteria employed by defendant to determine if they tend to perpetuate racial discrimination and are thus objectionable under the teaching of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971). As has been said before, SRI is a small organization and as the evidence established it cannot afford to operate an extensive training program for new employees. Instead it relies on the job market to acquire experienced personnel; and if after an employee is retained it is determined that he is not qualified that person is immediately dismissed. It would be unreasonable for this Court to expect the defendant to institute a training program which it cannot afford.

Considering the fact that SRI does not have a training program, do the standards it uses give "a reasonable measure of job performance"? 401 U. S. 436, 91 S.Ct. 856. Clearly the standards used by SRI are those qualifications needed by a wire-assembler who must work under a minimum of supervision and who must insure his own quality control. The high standards used by SRI are not an unnecessary, artificial, arbitrary barrier set up to keep out blacks, but are essential to allow defendant to operate in a competitive manner. Less restrictive criteria could result in an economic burden on defendant. This

subjectivity cannot be taken to make out a cause of action under § 1981 against a small business.

6. The requirements of the business necessity defense are discussed in United

Court finds that there is no acceptable alternative. Further, there is no evidence that the criteria operated to disqualify a substantially higher rate of blacks than whites, for there is no indication of how many blacks applied and were rejected. Defendant, however, did show that a number of blacks had been hired during SRI's very brief existence both before and after the McAdory complaint. Lastly, there is no evidence that the jobs in question had formerly been filled by whites as part of a longstanding practice of discrimination; for the very recent origin of SRI refutes the existence of a longstanding practice of discrimination.

This Court, therefore, concludes that a "legitimate business necessity" could have been made out by defendant had plaintiff been successful in shifting the burden.[6] The very complexity and the strict need for quality control of sophisticated instruments to be used in medical operations where the fate of a human life may be involved, furthermore, makes it imperative that defendant employ highly experienced and skilled people.

States v. International Longshoremen's Ass'n, 460 F.2d 497 (4th Cir. 1972); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971).