404 F.Supp. 573 (1975)
Floyd KEELY, Plaintiff,
v.
WESTINGHOUSE ELECTRIC CORP., Defendant.
No. 73 C 830 (4).
United States District Court, E. D. Missouri, E. D.
November 20, 1975.
*574 Arnold T. Phillips, Clayton, Mo., for plaintiff.
Herzog, Musgrave, Coburn, Croft & Shepherd, St. Louis, Mo., for defendant.

OPINION
NANGLE, District Judge.
Plaintiff Floyd Keely brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981.
This case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
1. The plaintiff, Floyd Keely, is a black male, resident of the State of Missouri and was during all times relevant herein a citizen of the United States.
2. The defendant, Westinghouse Electric Corporation ("Westinghouse") is a corporation engaged in industry affecting commerce, which at all times material to this action, employed more than 25 persons during each week of the calendar year and is an employer within the meaning of 42 U.S.C. § 2000e(b).
3. Westinghouse's St. Louis Repair Plant is approximately 300 feet by 200 feet. It is divided into four occupational groupings as follows:

Transformer Unit # 1
Winding Unit # 2
Machine Shop Unit # 3
Plant Services Unit # 4.

*575 There are twelve labor grades which determine an employee's hourly wages within the occupational groupings. In the plant services grouping, however, the highest labor grade attainable is grade 8.
4. The hourly work force, between July, 1965 and July, 1972 numbered approximately 34. Between July 2, 1965 and July 11, 1972, defendant hired 65 employees into the hourly workforce. Ten were black and 55 were white. Of all of defendant's hourly employees during this period, 14 were black and 95 were white.
5. Of defendant's hourly workforce between July 2, 1965 and July 11, 1972, no black held a labor grade higher than labor grade 6.
6. Of defendant's hourly white work force employed on July 11, 1972, 26 were employed at a labor grade higher than labor grade 6, representing 81.25% of such employees.
7. Of defendant's hourly workforce between July 2, 1965 and July 11, 1972, no blacks were employed in Occupational Grouping Unit 2. On July 2, 1965, there were no blacks employed in any Unit except Plant Services.
8. Defendant currently employs 2 blacks in Occupational Grouping Unit 2. One is labor grade 8 and the other is labor grade 5.
9. Of defendant's workforce as of July 11, 1972, 48% of the white hourly employees were employed in Occupational Grouping Unit 2.
10. Of defendant's black employees as of July 11, 1972 and black employees who terminated since July 2, 1965, a total of 14 black employees:
a) the highest labor grade attained by 3 black employees is labor grade 1 (learner), representing 21.42% of such employees;
b) the highest labor grade attained by 1 black employee is labor grade 2, representing 7.14% of such employees;
c) the highest labor grade attained by 2 black employees is labor grade 3, representing 14.28% of such employees;
d) the highest labor grade attained by 7 black employees is labor grade 5, representing 50% of such employees;
e) the highest labor grade attained by 1 black employee is labor grade 6, representing 7.14% of such employees;
f) the 3 black employees referred to in subparagraph a) above were employed by defendant for the following periods of time: 1 month, 16 days; 5 months; 2 months, 4 days.
11. Of defendant's white hourly employees as of July 11, 1972 and white hourly employees terminated since July 2, 1965, a total of 95 white employees:
a) the highest labor grade attained by 29 white employees is labor grade 1 (learner), representing 29.59% of such employees;
b) the highest labor grade attained by 3 white employees is labor grade 2, representing 3.06% of such employees;
c) the highest labor grade attained by 8 white employees is labor grade 3, representing 8.16% of such employees;
d) the highest labor grade attained by 13 white employees is labor grade 5, representing 13.26% of such employees;
e) the highest labor grade attained by 10 white employees is labor grade 6, representing 10.20% of such employees;
f) the highest labor grade attained by 1 white employee is labor grade 7, representing 1.02% of such employees;
g) the highest labor grade attained by 5 white employees is labor grade 8, representing 5.10% of such employees;
h) the highest labor grade attained by 1 white employee is labor grade 9, representing 1.02% of such employees;

*576 i) the highest labor grade attained by 7 white employees is labor grade 10, representing 7.14% of such employees;
j) the highest labor grade attained by 10 white employees is labor grade 11, representing 10.20% of such employees;
k) the highest labor grade attained by 8 white employees is labor grade 12, representing 8.16% of such employees.
12. As of July 11, 1972, all of defendant's black employees initially hired since July 2, 1965 have been initially hired into labor grade 1 (learner).
13. As of July 11, 1972, of defendant's white employees initially hired since July 2, 1965, a total of 12 initial hires:
a) 9 white employees have been initially hired into labor grade 1 (learner), representing 75% of such white hires;
b) 2 white employees have been initially hired into labor grade 3, representing 16.16% of such white hires;
c) 1 white employee has been initially hired into labor grade 6, representing 8.33% of such white hires.
14. Of defendant's hourly workforce on July 11, 1972, there were 4 black employees as follows:
a) 1 was labor grade 6, representing 25% of such employees;
b) 3 were labor grade 5, representing 75% of such employees.
15. Of defendant's hourly workforce on July 11, 1972, there were 32 white employees as follows:
a) 1 was labor grade 1, representing 3.12% of the total;
b) 1 was labor grade 3, representing 3.12% of the total;
c) 2 were labor grade 5, representing 6.25% of the total;
d) 2 were labor grade 6, representing 6.25% of the total;
e) 3 were labor grade 7, representing 9.37% of the total;
f) 3 were labor grade 8, representing 9.37% of the total;
g) 1 was labor grade 9, representing 3.12% of the total;
h) 5 were labor grade 10, representing 15.62% of the total;
i) 8 were labor grade 11, representing 25% of the total;
j) 6 were labor grade 12, representing 18.75% of the total.
16. In 1956, the plant services department was the only department with black employees.
17. When a vacancy occurs in a department, it is Westinghouse's policy to promote an employee within the same department. If none is available, the position would be filled by qualified employees from other departments. If the transferring employee is not fully qualified, transfer is still available. The transferee, however, was paid at the rate governing the job within the new occupational grouping to which he was qualified. If a pay reduction was required, the transferee could advance to the higher paying job within the occupational grouping once he acquired the necessary qualifications. If there were no employees who were available to transfer, a new applicant would be hired. Between July 2, 1965 and July 11, 1972, there were 5 transfers by hourly employees. Two of the 5 received slight pay increases. One of these 2 was black. The other 3 transferred without a change in pay.
18. Knowledge of job openings at Westinghouse was attained by word-of-mouth. Westinghouse did not post notices of the openings, nor was such posting required by the union contract in effect.
19. Plaintiff knew within one or two days when a job had opened.
20. Job descriptions for all jobs are agreed to by the union and Westinghouse.
21. The decision as to who will be promoted within occupational grouping *577 units is made by the plant manager in consultation with the foremen. Since July 2, 1965, Westinghouse has never employed a black plant manager or foreman.
22. Cecil Comes, plaintiff's foreman, evaluates persons for transfer or promotion, such decisions being based on work performance, ability, personality, and in the case of intra-departmental promotions, seniority.
23. On March 12, 1956, Keely was hired by Westinghouse as a learner, labor grade 1, in the plant services department.
24. On May 7, 1956 he was promoted to the position of Stripper Cleaner B in the same department and on January 14, 1957 he was promoted to the position of Painter Stripper Cleaner A.
25. In 1964, plaintiff requested a transfer to an opening in the Shipping and Receiving Department. This job was filled by Owen Morgan, an employee from the Transformer Department.
26. In 1965, plaintiff sought a job in the Machine Shop. The job went to Allen Whitworth.
27. During 1964, Keely attended one semester at O'Fallon Technical School and received training in the use of lathes, oxygen-acetylene welding equipment and the use of micrometers.
28. On June 14, 1967, plaintiff left Westinghouse's employ and moved to Michigan.
29. Keely returned to St. Louis in 1971 and on June 2, 1971 was rehired by Westinghouse as a painter-stripper cleaner, labor grade 5, and was given his accumulated seniority.
30. After plaintiff's return in 1971, he requested a transfer to the machine department. This request was the subject of several conversations between plaintiff and Westinghouse's supervisory personnel.
31. There was the probability of an opening in the machine shop at this time due to the approaching retirement of Mr. F. Asher. Mr. Asher did in fact retire in July, 1971.
32. After Asher's retirement, there was a lull and no new hiring was made.
33. When hiring began after the lull, Comes hired a new applicant to fill the opening in the machine shop; this employee remained only a short time.
34. When a second opening occurred in the machine shop, it too was filled by a new applicant who also remained only a short time.
35. Mr. W. Hefner was then hired. He had previously worked for defendant for 18 years in all areas of metal working.
36. Plaintiff would have needed training for a job other than painter-stripper cleaner.
37. Six months after plaintiff started working in 1971, he was told by Adam M. Leader, Plant Manager, that plaintiff could upgrade by transfer by seeking outside education.
38. On July 11, 1972, at plaintiff's request, plaintiff met with Mr. Comes and Richard Friest, International Brotherhood of Electrical Workers Union Local 1656 Shop Steward. Plaintiff was offered a transfer into the machine department at a labor grade 3. Plaintiff refused the offer because he was unwilling to take the pay cut, and he terminated his employment.
39. The evidence establishes that plaintiff was not qualified for the job openings in the machine shop without further on-the-job training necessitating a pay reduction, or further education.
40. The evidence fails to establish that those persons hired for openings in the machine shop were as, or less, qualified than plaintiff.
41. On July 13, 1972, plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission. On November 26, 1973, a Notice of Right to Sue was issued. This suit was timely filed on December 14, 1973.

*578 CONCLUSIONS OF LAW
This Court has jurisdiction over the subject matter and of the parties to this action in accordance with 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1343.
This Court concludes that plaintiff has failed to establish that the hiring policies of defendant are discriminatory.
In order to establish a prima facie case of employment discrimination, a plaintiff must show that he belongs to a racial minority, that he applied for and was qualified for a job opening, that he was rejected and that the employer continued to seek applications for the opening. McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). While statistics may be used to establish a prima facie case, Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970), the statistics produced herein fail to establish the same. Defendant's plant is small, employing only 34 persons. Of all of defendant's hourly employees from July 2, 1965 to July 11, 1972, approximately 14% were black. This amount does not justify the conclusion that defendant violated Title VII. In Parham, supra, statistics established a prima facie violation where they showed that less than 2% of defendant's workforce was black. That 14% of the employees were black, however, is not so disparate a percentage as to establish a prima facie violation of Title VII.[1]
Plaintiff has submitted evidence showing that blacks were earning less on the average than were defendant's white employees. Such statistics, however, are meaningless without more. Were evidence produced which showed that black employees with the same length of employment and the same qualifications were paid lower rates for similar jobs, or that no black employee earned more than any white employee, this Court might feel compelled to conclude that the disparity was due to racial discrimination. No such evidence has been established here. The average incomes, standing alone, are not sufficient in this Court's opinion to establish a violation of Title VII.
Similarly, the fact that 100% of the black employees hired by defendant between July 2, 1965 and July 11, 1972 started at learner, grade 1 while only 78.2% of the white employees hired during the same period started at the same grade is not sufficient in this Court's opinion. The evidence is silent as to the qualifications of the employees in relation to the pay level at which they began their employment. Just as Title VII does not require that every member of a minority be given a job regardless of his qualifications, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L. Ed.2d 158 (1971), neither does it require that every member of a minority start at a level of pay higher than his qualifications require. The statistical difference is not such an extreme one that it, by itself, compels this Court to find a Title VII violation. Accordingly, the Court finds that no discrimination can be inferred.
Plaintiff also presented evidence that showed that on July 2, 1965 there were no blacks in any department except plant services, and that on July 11, 1972, no black had ever been employed in Unit #2. It must be remembered that defendant's plant is small and that the number of employees is few. Plaintiff has failed to produce any evidence whatsoever, beyond these statistics, which would tend to show that there were blacks who had in fact applied for jobs in these units and were qualified. In McAdory v. Scientific Research Instruments, Inc., 355 F.Supp. 468, 475 (D.Md.1973) the *579 Court held that especially where a small company is involved, "mere citation of a general population figure without adequate correlation will not suffice" to establish a prima facie case of racial discrimination. Here plaintiff has merely recited to this Court the racial composition in each of defendant's departments. There was no testimony and no evidence concerning rejected but qualified applicants. See, e. g., Parham v. Southwestern Bell Telephone Co., supra, wherein plaintiff introduced statistical evidence and testimony by rejected applicants. Without further evidence, plaintiff's statistics concerning departments in a company employing only 34 persons are insufficient to establish a violation of Title VII.
Plaintiff has relied strongly on the use of statistics to establish his case. These statistics, however, fail to uphold the contentions made. This leads the Court to conclude that too many use statistics as a drunk man uses a lamppost  for support, and not illumination. In Harper v. Trans World Airlines, Inc., 525 F.2d 409 (8th Cir. 1972), the court held that "statistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded". Id. at 412.
Plaintiff asserts that defendant's transfer policy, though neutral on its face, perpetuates past discrimination in that a black employee, seeking to transfer to a department with higher pay levels, must take a pay cut in order to do so. The evidence, however, rebuts this. Of the five transfers between July 2, 1965 and July 11, 1972, two persons had the skills to enable them to transfer with an increase in pay. One of these two was black. The other three transferred at their existing pay level. This transfer policy does not operate to "`freeze' the status quo", Griggs v. Duke Power Co., supra, 401 U.S. at 430, 91 S.Ct. 849, nor can this Court conclude that the "employer's present advancement policy serves to perpetuate the effects of past discrimination, although neutral on its face . . .", Marquez v. Omaha District Sales Office, Ford Division of Ford Motor Co., 440 F.2d 1157, 1159-60 (8th Cir. 1971). The evidence introduced at trial establishes quite the contrary. Of the five transfers, none were required to take a pay cut. That one individual, who happend to be black and who would need training in a new job, would have been required to take a pay cut in order to transfer does not establish that the employer's policy serves to perpetuate past discrimination.
This Court concludes that the informal method of notifying employees of job openings does not violate Title VII. By plaintiff's own admissions, he was aware of all job openings. Defendant's plant is small and the evidence fails to establish that white employees were given any different notification of openings than were black employees. Parham v. Southwestern Bell Telephone Co., supra, is not in point. The policy condemned there involved an informal recruitment plan for new employees, which depended on the existing employees to refer new applicants for employment. The Court found that such a plan would tend to freeze the existing racial composition since white employees tended to recommend other whites. In the present case, however, the procedure involves the intra-company transfer of existing employees with all employees given equal notification. Since plaintiff has failed to establish how this procedure, which applies to both defendant's white and black employees, operates to the disadvantage of the black employees, and in fact admits that he knew of all job openings, this Court concludes that there has been no violation of Title VII.
This Court also concludes that defendant's criteria for promotion and transfer do not offend Title VII. The job descriptions adequately set forth the needed skills for each job. Of necessity there must be subjective evaluation by supervisory personnel in order to determine whether an employee has the requisite *580 skills. Plaintiff seems to feel that only purely objective criteria, such as seniority, should be used in making such determinations. Yet, promotions on the basis of seniority alone have been condemned under Title VII. United States v. St. Louis-San Francisco Railway Co., 464 F.2d 301 (8th Cir. 1972), en banc. Decisions as to promotions and transfers inevitably require an evaluation of the employee's performance and skills in light of the abilities needed in the new position. The job descriptions provide the necessary guidelines for the determination. There has been no showing that defendants discriminated among employees in applying these criteria. Absent such evidence, this Court finds no discrimination.
In consequence, judgment will be for the defendant.
NOTES
[1] This Court notes that according to the 1970 United States Census, the population of the St. Louis Standard Metropolitan Statistical Area (which includes the Missouri counties of Franklin, Jefferson, St. Charles, and St. Louis; the City of St. Louis; and the Illinois counties of Madison and St. Clair) was approximately 16% black. Of the population of the City of St. Louis and St. Louis County, approximately 19.1% are black.