**Saundra LEE and Louis Fant, Individually and on behalf of all persons similarly situated, Plaintiffs,**

v.

**CITY OF RICHMOND, Defendant.**

Civ. A. No. 77–0211–R.

United States District Court,
E. D. Virginia,
Richmond Division.

July 26, 1978.

Susan G. Moenssens, Moenssens & Moenssens, Richmond, Va., for plaintiffs.

James R. Saul, Asst. City Atty., Richmond, Va., for defendant.

## OPINION AND ORDER

CLARKE, District Judge.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (hereinafter Title VII). Jurisdiction is based on 28 U.S.C. § 1343(4), 42 U.S.C. § 2000e–5(f)(3). Plaintiffs, Saundra Lee and Louis A. Fant, sue on their own behalf and on behalf of all other persons similarly situated for injunctive relief, damages, promotion, back pay, front pay and any other relief which might be appropriate to put an end to the allegedly discriminatory employment practices of the Department of Data Processing of the City of Richmond, Virginia. The case was tried to the Court and decision was reserved until the trial minutes could be transcribed and briefs submitted. The Court having thoroughly reviewed the entire record, the proposed findings of fact and conclusions of law and arguments of counsel now renders its judgment.

### Parties and Issues

Plaintiff Saundra Lee is a black, female citizen of the United States and a resident of Henrico County, Virginia. Plaintiff Louis A. Fant is a black, male citizen of the United States and a resident of Henrico County, Virginia. Both plaintiffs are employed by the City of Richmond in the Data Processing Department (hereinafter Department). Lee works as "data entry transcriber" and Fant works as a senior EDP data control technician. Defendant City of Richmond (hereinafter City) is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

This action has been certified as a class action pursuant to Rule 23(b)(2), Fed.R. Civ.P., on behalf of all black persons who are now employed and who have in the past been employed by the City of Richmond in its Department of Data Processing on or after August 29, 1975.

Plaintiffs claim that the procedures utilized by the Department in selecting persons to fill vacancies and grant promotions are discriminatory and have an adverse impact upon black persons and that these procedures have had and continue to have a discriminatory impact on plaintiffs.

Plaintiffs claim the City has engaged and continues to engage in unlawful and discriminatory employment practices and policies which limit the employment and advancement opportunities for black persons.

Plaintiffs specifically claim that in the years 1973 and 1975 they were denied promotions to the position of programmer trainee because of their race.

### Methods of Proof

To prove their charges of discriminatory employment practices by the Department, plaintiffs have introduced extensive evidence concerning their own qualifications and the circumstances surrounding their failure to be promoted to the position of programmer trainee in 1973 and 1975. A large quantity of statistical data has been introduced to buttress plaintiffs' claims of a pattern of systematic racial discrimination throughout the Department. In addition, the testimony of other current or former employees of the Department was introduced to show both an overall pattern and individual instances of racially discriminatory employment practices.

### The Programmer Trainee Position

Although other claims have been made, the heart of the lawsuit involves the selection process for the programmer trainee

position. Therefore, the Court will deal with this issue before addressing the remaining claims.

Plaintiff Saundra Lee, an applicant for the trainee position in 1973 and 1975, is a black resident of Henrico County, Virginia, and is currently employed by the Department. Lee was hired by the Department on January 20, 1969, as a Keypunch Operator II at the biweekly salary of $176. She was promoted to Verifier Operator on December 6, 1975, at $303 biweekly and her job title was changed on July 31, 1976, to EDP Data Entry Transcriber with a biweekly salary of $319. She is currently earning $338 biweekly in the same position.

Lee is a graduate of Armstrong High School. Before being employed by the City, she worked for Central National Bank and C & P Telephone Company. Prior to October 1973, she attended a course at Richmond Technical Center which taught the computer language COBOL (an acronym for Common Business Oriented Language). Due to personal problems, she failed to complete this course. Lee has taught a course in keypunch at the Richmond Community Action program for approximately the past four years.

Prior to August 1975, Lee had informed her superiors, including Ruth Hughes, the Data Entry Manager, and Paul Banks, the Director of the Department, of her desire to advance into programming. To help achieve her goal of becoming a computer programmer, Lee in 1974 began using the video tape library made available to its employees by the Department. She generally worked in the library from 3:00–5:00 P.M. after her regular hours of employment and she eventually completed the video course. Additionally, Lee received guidance in programming from Curtis Finney, a black computer programmer, who helped her with a COBOL textbook, provided her with an IBM self-study course in programming which she completed and generally helped her with programming problems. Additionally, Lee completed several simple test programs under Finney's supervision. She was also given some test program assignments by Carl Lichvarcik, Manager of the Programming Division. None of her programs were put into operation by the Department. Finney thought Lee had the ability to be a programmer.

Lee has consistently been rated an above average or excellent data entry worker with initiative and tenacity. Because of her high degree of accuracy, she was regularly given the more complicated work in the Data Entry Division.

Louis A. Fant, an applicant for the programmer trainee position in 1973 and 1975, is a black resident of Henrico County, Virginia, and is currently employed by the City of Richmond's Department of Data Processing. Fant was hired by the Department of Data Processing on March 25, 1968, as a Tab Equipment Operator I, at the biweekly salary of $152. He was promoted to Tab Equipment Operator II on December 14, 1968, at the biweekly salary of $192. His job title was changed to EDP Control Technician on July 10, 1971, at the biweekly salary of $259. On November 24, 1973, he was promoted to Senior EDP Control Technician making $295 biweekly. At present, Fant works as a Senior EDP Data Control Technician and makes $411 every two weeks.

Prior to October 1973, Fant had earned a high school GED (general equivalency diploma), attended the Electronic Computer Programming Institute for nine months where he received a Certificate of Achievement, and completed a course at Richmond Technical Center which taught the computer language known as COBOL and in which he earned the grade of "B". He also had completed a course in leadership development offered by the Supervisory Development Program of the City of Richmond.

Fant, prior to October 1973, informed his superiors, including Paul Banks, Director of the Department, Tom Gammon, Computer Operations. Manager, and Tom Hatch, a supervisor in the Programming Division, of his desire to become a programmer. As a result of this ambition, Fant was given practice programming assignments by Department programmers. In most instances,

he failed to complete these practice assignments or failed to finish them on time. Fant did complete a test system program he worked on with three other employees, Cathy Rogers, David Rogers and James Baisey. The programs Fant did complete were considered inefficient by those monitoring his training. He was told prior to October 1973 by Tom Hatch that his programs were poorly done and that he simply was not suited to programming. (Hatch also told James Baisey, a white employee, who was studying programming, that his programs were not efficient and he was not programmer material. Baisey subsequently left City employment.) However, a program on tax refund payments written by Fant was put in actual operation by the Department. This program, a simple listing system, was extensively modified by other programmers before and after it went into production. Fant's experience and training in programming remained unaltered between October 1973 and August 1975, the dates the programmer trainee selections here in dispute were made.

Throughout his career in the Department, Fant has been considered by his supervisors to be a hard worker and has been above average in periodic employee evaluations. In his current position of Senior Control Technician, Fant is responsible for the tax section, one of the more difficult areas in his division, and has been evaluated as a dependable employee who does his job very well.

Dawn Maples Jamison, an applicant for the programmer trainee position in 1973 and 1975, is a black resident of Richmond, Virginia. She was hired by the City on October 18, 1971, as a keypunch operator. She was promoted to EDP Computer Operator sometime after October 1973 and still works in that capacity for the Department.

Prior to October 1973, Jamison had graduated from high school and completed two and one-half years of college at Virginia Commonwealth University and an additional year of business college at Smithdeal Massey. She discussed her desire to become a programmer with Carl Lichvarcik, Manager of the Programming Division, and Paul Banks, Director of the Department. Subsequent to October 1973, but prior to August 1975, Jamison completed and received the grade of "B" in the COBOL course given by Gary Darby at Richmond Technical Center. In the same time period, she utilized the video library for programming courses and completed several test programming assignments. Two of her programs, one dealing with school warehouses and one with school finances, were put into actual production.

Ralph Chalmers, an applicant for the programmer trainee position in 1975, is a black resident of Richmond, Virginia. He was hired by the City on December 31, 1971. In August of 1975, Chalmers was an EDP Computer Operator and was subsequently promoted to EDP Computer Operations Supervisor. Prior to August 1975, he had completed high school and started classes at J. S. Reynolds Community College. He also had attended the Electronic Computer Programming Institute for six months.

Penny Peters, an applicant for the programmer trainee position in 1973, is a white resident of Richmond, Virginia, who was employed by the Department as a Key Punch Operator II on October 5, 1973. She was promoted to EDP programmer trainee in October 1973 and subsequently to EDP programmer, the position she held when she left employment with the City in 1976.

Prior to October 1973, Peters had completed high school and five years of college. Peters' father, who was Director of Data Processing for Henrico County, was a personal friend of Mr. Breen, who was at that time Director of Richmond's Department of Data Processing. As a result of this friendship, Peters was allowed to utilize the Department's video tape library regularly from 3 to 5 P.M. during the hours she was supposed to be doing keypunch work. Additionally, Peters was allowed to work on programs while nominally attending to her keypunch duties. Prior to October 1973, Peters wrote and put into production operational programs. At the request of Mr. Breen, Gary Darby talked to Peters in order to evaluate her potential as a programmer.

After this conversation, Darby recommended to Breen that Peters not be considered for the programmer trainee position since in Darby's estimation she lacked the necessary credentials.

M. V. Rohrer, an applicant for the programmer trainee position in 1973, is a white resident of Richmond, Virginia, who was employed by the Department on January 4, 1973. Prior to October of 1973, he was a Senior EDP Computer Operator. Rohrer was promoted to programmer trainee in October 1973 and subsequently he became a programmer and finally a Senior Programmer. He left employment with the City on July 12, 1976.

Prior to October 1973, Rohrer had completed high school. He had taken courses in programming and has written several programs that were put into actual production by the Department.

R. D. Rogers, an applicant for the programmer trainee position in 1973 and 1975, is a white resident of Chesterfield, Virginia, and is currently employed by the Department. Rogers was hired on October 9, 1972, and was employed as an EDP computer operator until 1975 when he was promoted to programmer trainee. He subsequently became a programmer and then a senior programmer, which position he currently holds.

Prior to August 1975, Rogers had completed high school, one year of college at John Tyler Community College and an additional two years of college part-time at Virginia Commonwealth University. He had finished a course in COBOL and had completed a test system program for the Department with Cathy Rogers, James Baisey and Louis Fant. He had also completed several other data processing oriented courses.

W. D. Myers, an applicant for the programmer trainee position in 1975, is a white resident of Richmond, Virginia. He was hired by the Department on December 26, 1973. In 1975 Myers was an EDP Control Technician, and was promoted in August of that year to programmer trainee. Subsequently, he was promoted to Programmer and is now a Senior Programmer.

Prior to August 1975, Myers had graduated from high school and Smithdeal Massey Business College. He had completed the COBOL course at Richmond Technical Center and had taken a course on RPG, another computer language, at Smithdeal Massey. When Myers started as a control technician, he was trained for that job by Louis Fant. Subsequently, after expressing an interest in programming, he was given the opportunity to work on test programs. Although as a general rule, employees in the Data Control Division were not allowed to work on programs on City time, Myers was twice permitted while employed as a data control technician to work on programs due to go into production.

The position of programmer trainee (EDP Trainee II), which was filled twice in October 1973 and twice in August 1975, was an authorized position utilized by the Department only when qualified programmer could not otherwise be found, making it necessary for the City to train its own. Although a permanent programmer trainee position was considered desirable by both Mr. Banks and Mr. Lichvarcik and was recommended, budget approval was never secured. Hiring for the trainee position, as for all other positions within the Department, was not restricted to Department or City employees but was open to the entire Richmond population. The job description for EDP trainee II required a high school education and a demonstrated ability to write difficult programs as measured by a written test of programming ability. Listed as requirement in the job description were good knowledge of programming principles and machine language, ability to convert written data into coded subject matter and ability to work harmoniously. After the position was advertised in 1973 and 1975, the applicants were given a written examination. This examination had been devised by Gary Darby, the Department's Senior Systems Engineer, who had for several years taught a course in programming at Richmond Technical Center. This course was chiefly designed to teach the computer

language known as COBOL. Mr. Darby based the test given in 1973 and 1975 on prior exams he had devised and given in the Richmond Technical Center course. The test therefore primarily measured basic knowledge of the COBOL language. The test was not validated as effective for its intended purpose. The City's Personnel Department evaluated the applicants and based upon the amount of prior programming related work experience, formal educational achievement and programming knowledge, as reflected by the test scores, it certified a list of potential appointees to Paul Banks, the Director of the Data Processing Department. The number of certified candidates for the position pursuant to municipal law was to equal the number of vacancies plus five whenever enough suitable applicants were available. The candidates on the list were ranked according to their test scores but the latter were not determinative and the Director was free to choose whom he considered the most qualified from among those certified. Selection was not based on any set formula and was therefore subjective. Among the factors considered relevant to selection by Mr. Banks in 1973 and 1975 were the applicants' prior performance on programming assignments, whether the applicant had taken a course in COBOL, the applicant's total education and the applicant's total experience in the Department. Carl Lichvarcik, who advised Banks on selection and conducted interviews with applicants in 1975, considered attention to detail, problem solving abilities, creativity, tenacity and inquisitiveness to be important qualities in a programmer trainee.

In October 1973, Banks appointed Penny Peters and M. J. Rohrer to the programmer trainee position. Both Peters and Rohrer are white. Not appointed from the list of certified candidates were Saundra Lee, Louis Fant and Dawn Maples Jamison, who are black, as well as R. D. Rogers, who is white.

In August 1975, Banks appointed R. D. Rogers and W. S. Myers to the programmer trainee position. Both Rogers and Myers are white. Not appointed from the list of certified candidates were Saundra Lee, Louis Fant and Ralph Chalmers, who are black, and N. W. Loving and K. H. English, who are white. Additionally, Dawn Maples Jamison failed to secure certification by the Personnel Department.

Plaintiffs allege the appointment in each case discriminated on the basis of race.

*Conclusions of Law as to the Programmer Trainee Position*

■ The Court rules at the outset that any claims alleging racial discrimination in the 1973 selection of programmer trainees are now time barred since plaintiffs did not file the prerequisite charges with the Equal Employment Opportunity Commission until after August 1975. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Cates v. Trans World Airlines, Inc.,* 561 F.2d 1064 (2d Cir. 1977). Testimony concerning the 1973 selection will be considered, however, as background evidence relevant to the 1975 appointments.

The Court feels there has been no showing of disparate treatment of black employees in the selection of computer programmer trainees in August of 1975. There has been no evidence that blacks were treated in any objective way differently than whites in the processing and evaluation of their applications for these promotions. The Court finds that the credentials of black applicants for the job were given the same consideration and weight as like accomplishments of white employees. It is the Court's opinion, therefore, that the principles of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) do not govern the issues raised by the 1975 promotion.

Specifically, the Court finds that there were only two positions to be filled in 1975, that four whites and four blacks applied for these positions, that of the applicants four whites and three blacks were found qualified, that two whites were appointed and that three blacks and two whites were rejected for the positions. The Court further finds that after the rejections, the position

did not remain open and the employer did not continue to seek applicants from persons of complainants' qualifications.

 The Court finds on the basis of all the evidence introduced that the defendant could reasonably have determined that the black applicants were less qualified than the whites who were appointed. Although the subjective nature of some of the criteria for promotion may in certain circumstances indicate disparate treatment, the absence of objective guidelines for promotion does not necessarily make a prima facie case of discrimination. *Roman v. ESB, Inc.,* 550 F.2d 1343, 1354 (4th Cir. 1976); *EEOC v. duPont,* 445 F.Supp. 223 (D.Del.1978); *Agarwal v. McKee & Co.,* 16 EPD ¶ 8301 (N.D.Cal. 1977); *McAdory v. Scientific Research Instruments, Inc.,* 355 F.Supp. 468 (D.Md. 1973). The Court concludes that the elements of a prima facie case of disparate treatment under *McDonnell Douglas Corp. v. Green, supra,* are clearly not present on these facts.

The Court feels any discussion of the legal questions involved in the 1975 selection must begin with the Supreme Court's decision in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1973).[1]

In *Griggs* (401 U.S. at 431 and 436, 91 S.Ct. at 853 and 856), the Supreme Court stated:

> [The Civil Rights Act of 1964] proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.
>
> . . . . .
>
> Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and

mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant. What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract.

To be eligible for appointment as a computer programmer trainee, an applicant had to first be certified by the Department of Personnel. In 1973, apparently all who applied were certified. Of the six certified, three, Maples, Fant and Lee are black and three, R. D. Rogers, Peters and Rohrer are white. After certification, the choice of the "best qualified" was made by Director Banks. As noted above, the selection is not made according to any formula or formal weighing of candidate attributes. Based on a mix of various criteria, Banks selected two white appointees, Peters and Rohrer in 1973. In 1975, seven employees were certified, three black and four white. One black, Dawn Maples Jamison, failed to achieve certification. Of those certified, two whites were appointed to the trainee position.

The Court finds that a white employee, Penny Peters, was given preferential treatment by the Department in 1973. Although arguably better qualified on the basis of her COBOL test score and prior programming experience than Fant, Lee and Jamison, there is considerable evidence tending to show that she had been preselected for the programmer trainee position. The favorable treatment accorded Peters resulted from the friendship between her father and Mr. Breen, then Director of the Department. The Court finds, however, that the selection of Ms. Peters was not

---

1. See, *Teamsters v. United States,* 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 for a discussion of the differences between a "disparate treatment" and a "disparate impact" case. See also, *Furnco Construction Corp. v. Waters,* —— U.S. ——, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

racially motivated but rather was due to family friendship. It served to discriminate against blacks and white employees alike. Furthermore, there is no evidence that such favoritism was not a unique instance and it, therefore, cannot constitute a test of "cronyism" that is facially neutral but which serves to racially discriminate. *Cf. Local 53 of International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler,* 407 F.2d 1047, 1054 (5th Cir. 1969) (discussing nepotism). Since the Peters appointment was sui generis, its value as background evidence to the events of 1975 is virtually nil. The Court finds no special treatment in the selection of M. J. Rohrer for the position of programmer trainee in 1973.

A claim based upon disparate impact of necessity must show "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). At bar, there were three black and three white applicants for promotion to programmer trainee in 1973. Two whites and no blacks were selected. In 1975, there were four whites and four black applicants for promotion (including Ms. Jamison, who was not certified). Two whites and no blacks were selected.

■ The Court concludes that the numbers involved are too small to allow a finding of disparate impact under the *Griggs* rule. The total of applicants for 1973 and 1975 was fourteen, seven white and seven black. These very small figures are further reduced by the fact that some of the persons who were not appointed in 1973 reapplied in 1975. The number of different individuals who were applicants in 1973 and 1975 is only ten—four black and six white. Plaintiffs' statistical expert, Dr. William E. Walker, stated that although the larger the sample size the more reliable the conclusion, in certain situations he would stake his professional reputation on a conclusion drawn from a study of a sample comprising no

more than ten subjects. He did not, however, state any conclusion about the programmer trainee selection process except to repeat the uncontested fact that blacks who took the written COBOL test scored lower than whites who did so. Both plaintiffs' and defendant's expert, Nelson Sutton, testified that thirty is a generally accepted minimum of persons for a sample used in statistical testing. The Court notes also that the Department of Justice "Guideline in Employee Selection Procedures"[2] provides in part that

> an investigation of fairness requires the following:
>
> (1) [a] sufficient number of persons in each group for finding of statistical significance. These guidelines do not require a user . . . to conduct a study of fairness on a sample of less than thirty (30) persons for each group involved in the study.

The Court finds no evidence in the record that the small sample involved here can serve as a basis for extrapolating disparate racial impact.

> . . . statistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded.

*Harper v. Trans World Airlines,* 525 F.2d 409, 412 (8th Cir. 1975). See: *Teamsters v. United States,* 431 U.S. 324, 339–40 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Mayor v. Educational Equality League,* 415 U.S. 605, 620, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *Kendrick v. Commission of Zoological Subdistrict,* 427 F.Supp. 497, 500 (E.D.Mo.1976), aff'd, 565 F.2d 524 (8th Cir. 1977); *Navato v. Sletten,* 560 F.2d 340, 344 (8th Cir. 1977); *Morita v. Southern California Permanente Medical Group,* 541 F.2d 217, 220 (9th Cir. 1976), cert. denied, 429 U.S. 1050, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977); *Robinson v. City of Dallas,* 514 F.2d 1271, 1273 (5th Cir. 1975); *Friend v. Leidinger,* 446 F.Supp. 361, 371 (E.D.Va.1977); *Johnson v. Fulton Sylphon Division,* 439 F.Supp. 658, 668 (E.D. Tenn.1977); *Keely v. Westinghouse Electric*

**2.** 28 C.F.R. § 50.14 section 12b.(7) V.(1) (1977).

*Corp.,* 404 F.Supp. 573, 579 (E.D.Mo.1975). See also: Note *Employment Discrimination: Statistics and Preferences under Title VII,* 59 Va.L.Rev. 463, 478 (1973).

The Court's conclusion on this issue is reinforced by the fact that although none of the black applicants for the programmer trainee position were appointed, the position of programmer was and has been open to blacks. Currently, four of twenty-two programmers in the Department are black. This, therefore, is not a case involving the "inexorable zero" in the minority column where a critical evaluation of the significance of statistical data becomes less important. *Compare, Teamsters v. United States,* 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

■ Since the Court finds the plaintiffs' evidence is insufficient to show that the programmer trainee selection process was discriminatory in effect, the burden of validating this process never devolved upon the employer because "this burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination, *i. e.,* has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). The Court concludes that plaintiffs have failed to make out a case of racial discrimination in the selection of programmer trainees by the City of Richmond's Department of Data Processing.

### Pattern or Practice of Discrimination

Plaintiffs introduced extensive statistical data to show a pattern or practice of disparate treatment of black employees in the Department. The Department is divided functionally into five major divisions: (1) Systems Analysis; (2) Programming; (3) Computer Operations; (4) Data Control; (5) Data Entry. In the period 1972–1977, there have been up to forty-four different job classifications and thirty-three potential pay grades. The thrust of plaintiffs' case was to show that blacks have been systematically relegated to the less important divisions and job classification and the lower pay grades. The Court finds that the numbers of persons employed in the Department of Data Processing from 1972 to 1977, and the racial breakdown, are as follows:

| Year | Total | # White | # Black | % Black |
|------|-------|---------|---------|---------|
| 1972 | 78 | 60 | 18 | 23.07% |
| 1973 | 77 | 57 | 20 | 25.97% |
| 1974 | 88 | 65 | 23 | 26.13% |
| 1975 | 93 | 67 | 26 | 27.95% |
| 1976 | 95 | 69 | 26 | 27.36% |
| 1977 | 90 | 62 | 28 | 31.11% |

During 1972, 76 persons were employed in grades 16–40; during 1974, 84 persons; and during 1976, 93 persons. Of those persons, in 1972, 18 or 23.6% were black and 58 or 76.4% were white. In 1974, 22 or 26.1% were black and 62 or 73.9% were white. In 1976, 26 or 27.9% were black and 67 or 72.1% were white. Of the total number of persons employed in grades 28–40, in 1972, 5.3% were black; in 1974, 8.1% were black; and in 1976, 11.9% were black.

Of the blacks employed in grades 16–40, in 1972, 88.8% were employed in grades 16–27; in 1974, 86.1% were employed in grades 16–27; and in 1976, 88% were employed in grades 16–27. Of the whites employed in grades 16–40, in 1972, 41% were employed in grades 16–27; in 1974, 45% were employed in grades 16–27; and in 1976, 41% were employed in grades 16-27.

In 1972, 67% of the blacks employed in grades 16–40 were employed in grades 16–21; in 1974, 60% were employed in grades 16-21; and in 1976, 54% were employed in grades 16-21. In 1972, 12% of the whites were employed in grades 16–21; 16% of the whites were employed in grades 16–21 in 1974; and 13% of the whites were employed in grades 16–21 in 1976.

In 1972, there were two positions above the grade of 40; in 1973, 1974 and 1975, there were three positions above the grade of 40; in 1976, two positions above the grade of 40; and in 1977, one. All have been occupied by whites. None by blacks.

A total of thirteen persons have been hired into or promoted into the job of com-

puter programmer in the time period from 1972 through 1976. Of those 13, 8 have been hired into the position and 5 were promoted into the position. Of the eight persons hired, all were members of the white race. Of the five promoted into the position, all five have been white. In 1977, of a total of twenty-two programmers four are black and eighteen white.

The jobs of keypunch operator and verifier operators are essentially the same position, encompassing the same job duties, and the present job of data entry transcriber encompasses the previous jobs of keypunch and verifier operator.

Job # 14102, being Keypunch Operator II, grade 19, and Job # 14103, being Verifier Operator, grade 21, were merged into Job # 14102, Data Entry Transcriber, grade 21, in 1976.

Twenty-one employees occupied the job of Keypunch Operator II, Job # 14102, between 1972 and 1976 until the merger into the job of Data Entry Transcriber which also carries Job # 14102. Of those 21 employees, 14 or 67% were black and 7 or 33% were white.

A total of 12 employees have occupied Job # 14103, being Verifier Operator, from the same time period 1972 to 1976 until the merger of # 14102 and # 14103 into the new # 14102—Data Entry Transcriber. Of those 12 employees, 3 (or 25%) have been black and 9 (or 75%) were white.

Of those employees who were hired into position # 14102, grade 19, Keypunch Operator II, and position # 141102, grade 21, Verifier Operator, in the time period from 1972 to 1976, until the merger of both of those jobs into Data Entry Transcriber, grade 21, position # 14102, the breakdown is as follows:

Twelve persons were hired as keypunch operator # 14102, grade 19, being 8 blacks (67%) and 4 whites (33%).

A total of six persons were hired into the position of Verifier Operator, Job # 14103, grade 21, between 1972 and the merger in 1976, being 1 black (or 17%) and 5 whites (or 83%).

Since 1972, there have been a total of 13 employees, who are or have been in a position to evaluate employees who apply for promotions or transfers within the Department. Of these, 12 were white and 1 black.

The appointing authority for new hirings and promotions is in all instances vested in the Director of Data Processing, Mr. Paul P. Banks, who is a white male. The actual interviewing of certified candidates is usually performed by the employee who will be the supervisor of the area to which a new employee is assigned.

Employees are rated annually by their immediate supervisors and every rating must be reviewed, generally by the person occupying the second level of supervision over the employee being rated. The City's Personnel Manual, in its instructions to the supervisors on "How to Rate" states: "Most people are about average and almost nobody is outstanding."

The total number of individuals who have rated other employees is eighteen. Of these, 15 were white, and 3 black.

Of the eleven persons who have done the interviewing for initial selection and promotion between 1972 and the present, ten were white; one was black.

### Conclusions of Law as to Pattern or Practice

■ Whatever the method of proof, the plaintiffs bear the initial burden of making out a prima facie case of discrimination. And because in this part of the case, the plaintiffs have alleged a department-wide pattern or practice of resistance to the full enjoyment of Title VII rights the plaintiffs ". . . ultimately had to prove more than mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. [They] had to establish by a preponderance of the evidence that racial discrimination was the [Department's] standard operating procedure—the regular rather than the unusual practice." *Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). Although in this case plaintiffs have produced a wealth

of statistical evidence, they have failed to show a pattern or practice of racial discrimination.

The black population of the Richmond, Virginia, Standard Metropolitan Statistical Area (SMSA)[3] in 1970 was 26.46% of the whole and the percentage of the work force (16 years and older) which was black was 24.66%. The representation of black employees in the Department ranged from 23.07% in 1972 to 31.11% in 1977. Although a high percentage of the black employees filled lower paying positions and the topmost positions were never filled by blacks, these abstract facts do not, under the circumstances of the case, make a showing of racial discrimination. The Department consists of five operating divisions. The function of each division, although vital to the operation of the Department as a whole, is discrete and there is no career ladder between divisions or logical order of progression for employees from one division to another. When openings occur in any position in the Department, persons both in and outside City employment may apply. There is no seniority system or preference given to City employees. Except with regard to seven positions for which formal written tests were given by the Department (and which will be dealt with below), plaintiffs have wholly failed to show the number or percentage of black employees who have applied for better paying positions and have been rejected. They have failed to shown any black person who has been deterred from seeking employment or promotion with the Department due to its reputation for discrimination. They have failed to show the number of blacks available in the Richmond SMSA for the various skilled jobs in which they claim that blacks are underrepresented. The plaintiffs' claim that blacks in the Data Entry Division have more special training or education than whites would, if accepted by the Court, failed to raise an inference of discrimination unless it were shown that some blacks were excluded from employment in favor of less qualified whites. Although the plaintiffs' expert consistently rendered the opinion that blacks occupied lower paying positions and failed to earn promotions in greater percentage than was statistically to be expected, the Court finds that his conclusions are unpersuasive. Since the plaintiffs produced no information on the number of blacks available in Richmond with the requisite skills for the higher paying jobs or who had actually applied for the higher paying jobs, it is difficult to understand how plaintiffs' expert arrived at what the expected black representations in those higher paying jobs should be. Likewise, a discrepancy between black and white average advancement in grade is not significant unless it reflects the fact that the blacks in the same position as whites and with the same qualifications have been passed over in favor of whites. The Court finds that in this respect the greatest turnover in jobs has been in the lower paying position. Although black representation in the better paying grades was small, this is the area of smallest turnover and fewest black applications. The following positions in the higher pay grades are held by a white incumbent: data entry supervisor, appointed 1971; data entry manager, appointed 1970; EDP chief of operations, appointed 1969; EDP senior systems engineer, appointed 1971. The following higher paying positions have been filled more recently but no blacks applied for them: EDP program manager; EDP computer control specialist; EDP systems analysis manager. Two blacks were certified for the position of systems analyst; one proved to be a financial analyst and was disqualified; the other, Mr. James F. Jackson, was appointed and currently works for the Department as a senior systems analyst. The position of EDP systems engineer was filled once. A black was certified for the position and the Department wished to appoint him but he changed his address and the City was not able to track him down. The position of programmer has been filled thirteen times in the period 1972 to 1976. Eight positions were filled by hir-

---

3. The Richmond SMSA besides the City of Richmond includes the Counties of Charles City, Chesterfield, Goochland, Hanover, Henrico, New Kent and Powhatan.

ing and five by promotions. All of the new programmers were white. Plaintiffs have not shown that any blacks applied for the position. Although blacks had applied for the position of programmer trainee, this is by its very nature a training position and quite different in its duties, required knowledge, skills, ability and minimum training and experience from the programmer position. The position of Director of the Department was filled three times in the past ten years. There is no evidence that any black applied for the position.

■ The Court finds that blacks represent a larger percentage of the work force of the Department than they do of the Richmond work force at large. The higher pay grades in the department require highly skilled employees and plaintiffs' proof that only a few blacks hold these jobs absent some showing of the number of blacks with the requisite skills in the Richmond job market fails to raise an inference of discrimination.

> When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

*Hazelwood School District v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977).

The commission also asserts that the company discriminates in its promotion policies governing positions that are excepted from the [ ] seniority plan. Most of these jobs require specialized abilities or a specific technical background and many carry supervisory responsibilities. Openings for these jobs are posted for bidding by all employees, and the railroad may select the applicant it considers best qualified. Prior to 1967, all 76 excepted positions were held by white employees. Of the 51 positions still in existence in 1976, only one was held by a black employee. The commission's proof disclosed only seven vacancies during the time pertinent to this suit. One was filled by a black employee.

The statistical evidence concerning appointments to these excepted positions since the enactment of Title VII reveals that the company filled 14% of the vacancies with the promotion of a single black employee. *In the absence of data concerning the number of qualified black persons in the labor pool, the commission's evidence is insufficient to establish a prima facie case of racial discrimination against black employees as a class.* (emphasis added)

*EEOC v. Chesapeake & Ohio Railway Co.*, 577 F.2d 229 (4th Cir. 1978).

■ Plaintiffs have not made out a prima facie case by showing that some divisions in the Department do not approximate the racial makeup of the Department as a whole. See, *Swint v. Pullman-Standard*, 539 F.2d 77, 94 n. 40 (5th Cir. 1976). Title VII does not require a racially balanced work force. *Lewis v. Tobacco Workers International Union*, 577 F.2d 1135 (4th Cir. 1978), and the fact that whites "outnumber blacks in the higher job classifications and blacks outnumber the whites in the lower classifications" does not in itself indicate racial discrimination. Likewise, "[a]bsent a showing of qualified black applicants being available and not being hired or promoted into these skilled jobs, there is no discriminatory practice proven." *Roman v. ESB, Inc.*, 550 F.2d 1343, 1353 and 1355 (4th Cir. 1976). *See also, Teamsters v. United States*, 431 U.S. 324, 339-40 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Louis v. Pennsylvania Industrial Development Authority*, 371 F.Supp. 877, 885 (E.D.Pa.), *aff'd*, 505 F.2d 730 (3d Cir. 1974), *cert. denied*, 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1379 (5th Cir. 1974); *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. 468, 475 (D.Md.1973).

### Disparate Impact of Hiring and Promotional Tests

Plaintiffs also introduced evidence intended to prove the discriminatory impact of the selection procedure for certain positions within the Department.

Formal written tests were given for the following positions: (1) programmer trainee; (2) computer operator; (3) data entry transcriber; (4) verifier operator; (5) keypunch operator; (6) control technician; (7) EDP scheduler. The Court has already discussed the programmer trainee selection process.

Written tests for control technician were given in 1971 and 1972. A total of fifteen black and fifteen white individuals took the examination. The average score for the white test takers was 51.98% and for the black 31.19%.

Written tests for computer operator were given in 1971, 1973, 1974, 1975, 1976, and 1977. A total of twenty-nine white and twenty-three black individuals took the test. The average score for black test takers was 53.59; the average for white 68.66.

Written tests for verifier operator were given in 1971, 1972, and 1975 and 1976. A total of five white and twelve black individuals took the examination. The average score for the white test takers was 60.9; the average for the black 59.53.

Written tests for the position of data entry transcriber, keypunch operator II and keypunch operator I (identical or highly similar positions) were given in 1971, 1972, 1973, 1974, 1975, 1976 and 1977. A total of eighty-six black and twenty-six white individuals took the examination. The average score for the black test takers was 79.29; the average for the white was 80.60.

A written test for EDP scheduler was given in 1971. A total of thirteen whites and two blacks took the test. The average score for black test takers was 42.05; the average for whites 41.42.

■■■■ The Court finds that the test score data outlined above does not demonstrate disparate impact under *Griggs* and its progeny. Only one of the test series, that for data entry positions, had sufficient individuals participating to allow reliable conclusions to be drawn concerning any racial bias inherring in the test itself. And there, the black and white average scores were virtually identical. As discussed earlier in this opinion, the Court does not find extrapolation from very small samples to be probative of disparate racial impact. Equally important is the fact that the test scores do not indicate the rate of selection for these positions. The test scores comprise only one factor utilized in the selection process. The crucial fact in determining disparate impact is the rate at which blacks are ultimately chosen for the position rather than their test scores made in the process of selection. See, *Smith v. Troyan*, 520 F.2d 492, 498 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); *Friend v. Leidinger*, 446 F.Supp. 361, 372-73 (E.D.Va.1977). The Court concludes that plaintiffs have failed to prove a racially correlated differential in selection of employees for any of the positions for which a written test was given.

### Individual Instances

In addition to evidence pertaining to disparate impact of selection procedures and statistical data relating to pattern or practice of disparate treatment plaintiffs offered individual testimony intended to show systematic discrimination against blacks in the conditions of employment.

### Saundra Lee

Plaintiff Saundra Lee testified that she worked harder than her white coworkers in that when she started in the data entry division three people keypunched payroll system data but that she now does the job alone despite an increase in the payroll system workload. Assuming that this is true, the Court finds that any extra work done by Lee is due to her efficiency as a keypuncher. All the evidence indicates that she is perhaps the best worker in the data entry division, completes her work quickly and is given the more difficult formats to punch. In most instances, there is more than enough work to occupy the employees in the data entry division. When one task is performed, the keypuncher draws the next assignment from the supervisor. There is no evidence that Ms. Lee or any other black data entry employees are given more work because they are black.

Although Lee's efficient performance was reflected in above average periodic evaluations of her by her supervisors, she testified that she was entitled to even better rating than those she received. There is no evidence that Lee's performance was rated lower than comparable performance by a white employee.

██ Lee testified (and this evidence was corroborated by several other witnesses) that blacks were seated separately from whites in the data entry section. The Court finds that seating had normally been assigned without regard to race and that only after the black employees of the division asked for separate seating was the division into a white and black area accomplished. The Court finds this to be a voluntary measure initiated by the black employees and therefore, does not constitute discrimination by their employer.

The Court finds that Penny Peters, a white employee, was allowed to do programming work while working in the data entry division and Ms. Lee was not. However, the favoritism shown to Peters was unique and tended to disfavor all other employees, both black and white. As in the case of Peters' promotion to programmer trainee, the Court finds no racial discrimination on the part of the defendant.

██ Lee also complained of discrimination in the assignment of working hours. Contrary to her assertion, however, the Court finds that she was given special consideration as to her assigned work shifts, initially due to her having a young child at home and thereafter because she was teaching a course in keypunch after working hours. The Court finds no evidence of discrimination in the assignment of working hours to Ms. Lee or any of the other black employees in the Data Entry Division.

██ Racial discrimination in the assignment of overtime was asserted by Ms. Lee and others in the Data Entry Division. During the period of alleged disparate treatment, there were two shifts—7 a. m. to 3 p. m. and 8:30 a. m. to 5 p. m. Employees in the shift ending at 3 p. m. were asked if they would work overtime before the employees on the shift ending at 5 p. m. were. The Court feels this a logical and justifiable managerial arrangement. Furthermore, the fact that there were more whites than blacks on the 7 a. m. to 3 p. m. shift and that therefore more whites than blacks were first asked about overtime was entirely fortuitous. The Court, therefore, finds that whites as a group were not given priority over blacks in the allocation of overtime in the Data Entry Division.

### Lessie Gamble

██ Lessie Gamble, a black data entry transcriber, testified that blacks in the Data Entry Division are asked to do more work than whites. Ms. Gamble offered no proof to support her impressions and the Court finds no evidence that employee workloads in the Data Entry Division are differentiated on the basis of race.

██ Gamble applied for the positions of verifier operator and control technician but in each instance she was not selected and a white person was appointed. No evidence was introduced which tended to show that the whites selected were not more qualified for the position than she. The Court finds no unlawful discrimination against Ms. Gamble on this evidence.

### Margaret Allen

██ Margaret Allen is a black data entry transcriber who was hired by the Department in 1975. Ms. Allen testified that she was not given proper instruction by her white supervisor as to what duties her job entailed and that she therefore had to learn the job on her own—which she did. She complained that her performance was rated average while that of a white coworker, whom Allen did not think highly of, was rated outstanding. The Court finds that the amount of job orientation given was not determined on the basis or race. Furthermore, the assertion of disparate supervisory evaluations were grounded on vague hearsay information. The recorded evaluations of Ms. Allen and her coworkers were not introduced into evidence and therefore, no

inference of discrimination in employee ratings can be drawn from this record.

### Alice Herman

Alice Herman, a black employee in the Data Entry Division, testified that she was told by Ruth Hughes, her white supervisor, to stop polishing her fingernails and smoking cigarettes at her desk during work breaks because the fumes bothered some white coworkers seated next to her. Whites and other blacks were permitted to do the same acts if they chose to, absent complaint by a fellow worker. Ms. Herman could have taken her break, smoked and painted her nails outside the data entry room if she chose to do so.

Ms. Herman received low ratings by her supervisor, Ruth Hughes, and had merit raises held up on two occasions. The first was due to her failure to achieve a 97% accuracy rating for transcription during her initial probationary period. The second instance was due to her uncooperative conduct regarding her coworkers manifested in the smoking and nail polishing incidents noted above.

■ The Court finds no racial animus in the actions of Ms. Herman's supervisor. Ruth Hughes' actions in attempting to adjust the conflict concerning smoking and nail polishing appear to be those of a responsible manager. The two instances of withholding raises appear to be racially neutral administrative actions. In short, the Court finds no unlawful racial discrimination against Ms. Herman in these matters.

### Curtis Finney

■ Curtis Finney was hired by the Department in 1967 as a tabulating equipment operator. He subsequently was promoted to computer trainee, computer operator, senior computer operator, programmer trainee, programmer, senior programmer and finally, lead programmer. While a senior computer operator, Finney trained a white employee, Brad Yancey. Yancey was subsequently promoted several times and is now a systems analyst which is a pay grade higher than Finney's position of lead programmer. No other evidence was introduced on the relative abilities and performances of these two men. The Court is unable to conclude on these facts that Finney was unfairly held back or Yancey unfairly advanced on the basis of race.

### Fecil West-Bey

■ Fecil West-Bey, a black, transferred into the Department from the school board in 1973. West-Bey and Richard Van Orden, a white, who also transferred, had held similar positions in the school board's data processing section. At that time, the Department had only one supervisory position in computer operations open and West-Bey was selected over Van Orden as third shift (11 p. m. to 7 a. m.) computer operations supervisor. In February of 1974, West-Bey's wife was injured and he sought a change to a day shift. Van Orden who worked such a shift was willing to switch with West-Bey. However, Van Orden was in a lower pay grade and West-Bey while anxious to work days was unwilling to take a pay cut. West-Bey's request for transfer to the day shift was denied. On these facts, the Court is unable to discern racial discrimination on the part of the defendant.

### Uster A. Johnson

■ Uster A. Johnson is a black computer programmer who was hired by the Department in 1977. Two months after completing his probationary period, Johnson applied for the position of senior programmer and was not chosen. Cathy Ellison Rogers, a white woman, was selected instead. Although Johnson had B.S. and M.S. degrees in mathematics, he had no prior employment experience in programming before coming to the Department. The Court finds that Ms. Rogers, a longtime Department employee, with known experience in programming was the better qualified candidate and that Johnson's rejection was not due to his race.

### Donnie L. Smith

■ Donnie L. Smith is a black data control technician. He began working in

the Department as a federal CETA (Comprehensive Education and Training Aid) employee and was switched over to the City payroll as a utility operator. He was subsequently promoted to his current position. Smith works under Merle Garrett, a white senior control technician. Garrett works an 8 a. m. to 4:30 p. m. shift. Smith works from 10:30 a. m. to 7 p. m. Smith complains that when Garrett is out sick other workers, including Shirley Trower, the computer control manager, take over her workload. On the other hand, when he is out sick, no one takes over his slot and the work piles up. The defendant introduced evidence that Garrett's work must be completed on a daily basis and that other employees of necessity must process her work if she is not there. Furthermore, the testimony showed that Smith's work also had to be completed on a daily basis and that Smith has worked (and has been paid extra for) overtime when necessary to accomplish this. In addition, other employees, including a Mr. Miller, the supervisor of the second shift, give Smith assistance to make sure the daily deadline is met. The Court finds the defendant's version of the fact persuasive and detects no racial discrimination on this evidence.

### Violet Jefferson

■ Violet Jefferson is a black senior control technician. She complains that previously the white senior control technician in her position had a control technician as an assistant. Despite an increase in workload, she has been given no assistant although Donnie Smith was assigned to help her for a period of six to seven months. Despite this set of circumstances, she processes her workload during the hours of a normal work week and her performance evaluations have consistently been high. The Court finds no evidence of racial discrimination on these facts.

■ Ms. Jefferson also asserts that she worked one full year as a control technician while being paid the lower salary of a keypunch operator. The Court finds the facts to be somewhat different. It appears that Ms. Jefferson, who was then a keypunch operator, was given the opportunity to learn the control technician job which she accepted. Instead of going through the process of having a control technician trainee position authorized, the Department simply put Ms. Jefferson in the data control division to learn the technician's job while paying her the salary of a keypunch operator. The latter salary was higher than that of a control technician trainee though, of course, lower than that of a control technician. After approximately six months, Ms. Jefferson was promoted to the position of control technician and was paid a commensurate salary. There is no evidence that any white employee in a similar situation was more favorably treated. The Court finds no racial discrimination on the basis of these facts.

### Diane McQueen

■ Several witnesses testified that Joyce Bowden, a white employee of the Department, who did not have a high school diploma or GED (General Equivalency Diploma), was allowed to continue working while Diane McQueen, a black who also lacked a high school diploma, was terminated for this reason. The Court finds that Ms. Bowden was not hired by the Department but transferred into it as part of the Department's takeover of the school board data processing function in 1973. A total of eighteen white and five black employees came into the Department as a result of this merger. The school board had different and often lesser employment standards than did the Department and Ms. Bowden, who was hired by the school board, was allowed to work for the Department following the transfer although she would not initially have been hired by the Department. Diane McQueen was referred to the Department through the Richmond Community Action Program. Since she lacked a high school diploma or GED, she was hired as a keypunch trainee on the express condition that she secure a GED as soon as possible. She remained in the trainee position for several years and although she was

encouraged to get her equivalency diploma, she never did so. She eventually was terminated. No other incident was shown of a white being employed without a diploma or GED. On these facts, the Court finds no racial discrimination on the part of the defendant.

### Miscellaneous

Carl Lichvarcik, formerly programming manager in the Department, testified that Tom Gammon, computer operations manager, had used the term "niggers" when referring to blacks in general and that he told racial and ethnic jokes.

Lessie Gamble, a data entry transcriber, testified that Ruth Hughes, the white data entry manager, brought her daughter, Rhonda, to work on several occasions and that Rhonda used to play with and kiss Saundra Lee, who is black. On a subsequent occasion, however, Rhonda would only shake Saundra's hand. When Lessie Gamble asked her why, Rhonda informed her that her mother, Ruth Hughes, had cautioned her not to kiss black people.

The incident involving Gammon was brought to the Department Director's attention and was investigated. Although it is unclear whether Director Banks found that Gammon had actually used racist language the evidence showed that Gammon was warned by Banks that such attitudes and behavior were unacceptable and would not be tolerated. There is no evidence of any further racist remarks or attitude displayed by Gammon.

█ The Court feels that whatever this testimony shows about the personal feelings of Gammon and Hughes, it does not amount to proof of racial discrimination in the condition of employment. Title VII forbids employer from treating employees differently on the basis of race, it does not purport to outlaw privately held feelings of bigotry among employees. There is no evidence that either Gammon or Hughes expressed any feeling of racial bias to black employees that worked with them or allowed racist beliefs to affect their performance as supervisors of black employees.

The Court does not find this evidence probative of racial discrimination on the part of the employer. See: *Friend v. Leidinger,* 446 F.Supp. 361, 382–83 (E.D.Va.1977); *Howard v. National Cash Register Co.,* 388 F.Supp. 603 (S.D.Ohio 1975); *Fekete v. United States Steel Corp.,* 353 F.Supp. 1177 (W.D.Pa.1973).

In summary, the Court concludes that plaintiffs have failed to prove particular instances of racially premised disparate treatment of the named plaintiffs by the defendant or a pattern or practice of racially premised disparate treatment by the defendant of the class of employees plaintiffs represent. Additionally, plaintiffs have failed to prove a racially disparate impact of the defendant's employee selection procedures.

█ The class tentatively certified by the Court on June 27, 1977, pursuant to Rule 23(b)(2), Fed. R. Civ. P., consisted of "all black persons who are now employed and who have in the past been employed by the City of Richmond in its Department of Data Processing on or after August 29, 1975." A motion by defendant to decertify the class was opposed by plaintiffs and denied by the Court. The Court's Order for due notification of class members both currently and formerly employed by defendant was properly effectuated by plaintiffs. This case has been prosecuted throughout as a class action. Although the named plaintiffs have failed to prove either their individual claims or the claims on behalf of the class, the Court finds the requirements of Rule 23(a) and (b)(2) have been met. Therefore, pursuant to Rule 23(c)(3), the Court confirms the class certification ordered on June 27, 1977, and enters final certification of a class composed of all black persons who are now employed by the City of Richmond in the Department of Data Processing on or after August 29, 1975, up to the date of trial, December 13, 1977. Judgment is entered for the defendant against the named plaintiffs and the class they represent.